# EXHIBIT A

OMB No. 1121-0329
Approval Expires 11/30/2020

**U.S. Department of Justice**
Office of Justice Programs
*Office of Juvenile Justice and Delinquency Prevention*



The [U.S. Department of Justice](#) (DOJ), [Office of Justice Programs](#) (OJP), [Office of Juvenile Justice and Delinquency Prevention](#) (OJJDP) is seeking applications for funding under the fiscal year (FY) 2018 Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children. This program furthers the Department's mission by strengthening community capacity to stem violence and reduce youth offending and victimization, improving the response to children's exposure to violence, and enhancing public safety.

# OJJDP FY 2018 Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children

## Applications Due: October 04, 2018

## Eligibility

Eligible applicants are limited to law enforcement agencies in states (including territories), local governments, and federally recognized tribal governments as determined by the Secretary of the Interior.

OJJDP welcomes applications under which two or more entities would carry out the federal award; however, only one entity may be the applicant. Any others must be proposed as subrecipients (subgrantees).[1] The applicant must be the entity that would have primary responsibility for carrying out the award, including administering the funding and managing the entire project. Under this solicitation, only one application by any particular applicant entity will be considered. An entity may, however, be proposed as a subrecipient (subgrantee) in more than one application.

OJJDP may elect to fund applications submitted under this FY 2018 solicitation in future fiscal years, dependent on, among other considerations, the merit of the applications and the availability of appropriations.

---

[1] For additional information on subawards, see "Budget and Associated Documentation" under [Section D. Application and Submission Information](#).

In addition, as discussed further below, to the extent the applicant is a state or local government entity, in order validly to accept an FY 2018 award under this solicitation, the chief legal officer of that entity must properly execute, and the applicant must submit, the specific certifications regarding compliance with certain federal laws, attached to this solicitation as Appendices D and E.  The text of these statutory provisions appear in Appendix B.  (Note: This requirement does not apply to Indian tribal governments.)

# Deadline

Applicants must register with Grants.gov at https://www.grants.gov/web/grants/register.html prior to submitting an application. All applications are due by 11:59 p.m. eastern time (ET) on October 04, 2018.

To be considered timely, an application must be submitted by the application deadline using Grants.gov, and the applicant must have received a validation message from Grants.gov that indicates successful and timely submission. OJP urges applicants to submit applications at least 72 hours prior to the application due date to allow time for the applicant to receive validation messages or rejection notifications from Grants.gov, and to correct in a timely fashion any problems that may have caused a rejection notification.

OJP encourages all applicants to read this Important Notice: Applying for Grants in Grants.gov.

This deadline does **not** apply to the receipt of certifications regarding compliance with certain federal laws.  (See Appendices D and E.)  As explained below, an applicant that is either a state or local government entity may not validly accept an award, however, unless those certifications are submitted to OJP on or before the day the applicant submits the signed award acceptance documents.

For additional information, see How to Apply in Section.

# Contact Information

For technical assistance with submitting an application, contact the Grants.gov Customer Support Hotline at 800–518–4726 or 606–545–5035, at https://www.grants.gov/web/grants/support.html, or at support@grants.gov. The Grants.gov Support Hotline operates 24 hours a day, 7 days a week, except on federal holidays.

An applicant that experiences unforeseen Grants.gov technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service Response Center (Response Center) at grants@ncjrs.gov **within 24 hours after the application deadline** to request approval to submit its application after the deadline. Additional information on reporting technical issues appears under "Experiencing Unforeseen Grants.gov Technical Issues" in the How To Apply section.

For assistance with any other requirements of this solicitation, contact the Response Center by telephone at 800–851–3420 or TTY: 301–240–6310 (hearing impaired only) or by email at grants@ncjrs.gov. Response Center hours of operation are 10 a.m. to 6 p.m. ET, Monday through Friday, and 10 a.m. to 8 p.m. ET on the solicitation close date. General information on applying for OJJDP awards can be found at https://www.ojjdp.gov/funding/funding.html.

Answers to frequently asked questions that may assist applicants are posted at
https://www.ojjdp.gov/grants/solicitations/FY2018/FAQ/GangUAC.pdf.

Grants.gov number assigned to this solicitation:  OJJDP-2018-13845

Release date: June 28, 2018

Update date: September 7, 2018

# Contents

A. Program Description .................................................................................................5

    Overview ...................................................................................................................5

    Project-Specific Information .....................................................................................7

    Goals, Objectives, and Deliverables........................................................................7

    Evidence-Based Programs or Practices .................................................................10

    Information Regarding Potential Evaluation of Programs and Activities.................12

B. Federal Award Information ......................................................................................12

    Type of Award ........................................................................................................12

    Financial Management and System of Internal Controls ........................................12

    Budget Information..................................................................................................13

    Cost Sharing or Match Requirement ......................................................................13

    Preagreement Costs (also known as Preaward Costs). ..........................................13

    Limitation on Use of Award Funds for Employee Compensation; Waiver ..............14

    Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs...........14

    Costs Associated With Language Assistance (if applicable) ..................................15

C. Eligibility Information ...............................................................................................15

D. Application and Submission Information .................................................................15

    What an Application Should Include ........................................................................15

    How To Apply..........................................................................................................31

E. Application Review Information ...............................................................................34

    Review Criteria........................................................................................................34

    Review Process ......................................................................................................35

F. Federal Award Administration Information ..............................................................36

    Federal Award Notices ...........................................................................................36

    Administrative, National Policy, and Other Legal Requirements ...........................37

    General Information About Post-Federal Award Reporting Requirements...............39

G. Federal Awarding Agency Contact(s) .....................................................................40

    Freedom of Information Act and Privacy Act (5 U.S.C. 552 and 5 U.S.C. 552a)............40

    Provide Feedback to OJP .......................................................................................40

    Appendix A: Performance Measures Table.............................................................42

    Appendix B: Applicable Federal Law......................................................................52

    Appendix C: Federal Communication Information....................................................58

    Appendix D: Certification Relating to  8 U.S.C. .....................................................59

    Appendix E: Certification of Compliance ................................................................60

    Appendix F: Application Checklist ..........................................................................61

OJJDP-2018-13845

# 2018 OJJDP FY 2018 Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children

# CFDA #16.544 and #16.123

## A. Program Description

**Overview**

Unaccompanied alien children (UAC) are defined in statute (P.L. 107–296 and P.L. 110–457) as children who lack lawful immigration status in the United States, are younger than age 18, and are without a parent or legal guardian in the United States who is available to provide care and physical custody.[2] Based on apprehension counts from the United States Border Patrol (USBP), recent trends suggest that the majority of UAC are younger than age 13.[3] UAC often enter and are apprehended at the southwestern border. During the first two months of FY 2017 (October and November 2016), USBP apprehended 14,128 UAC. As a basis for comparison, apprehensions in the first two months of FY 2015 and FY 2016 numbered 5,143 and 10,588, respectively.[4] A 2017 letter from Barbara Pisaro Clark, the Acting Assistant Secretary for Legislation, Department of Health and Human Services, informed the Senate Committee on Homeland Security and Governmental Affairs that although there are no official statistics on UAC and gang involvement, UAC present fertile recruiting opportunities for violent gangs in their facilities based on a case file review.[5] [6]

Law enforcement agencies and researchers have yet to establish a universal definition for gang(s) or gang member(s). To date, all states (including the District of Columbia) have some form of legislation that defines "gang" and "a gang member" or specifies "gang-related activity."[7]

[2] Kandel, W. 2017. Unaccompanied Alien Children: An Overview. Congressional Research Service. Washington, DC, https://fas.org/sgp/crs/homesec/R43599.pdf.

[3] White House, DHS and HHS, "Press Call Regarding the Establishment of the Inter-Agency Unified Coordination Group on Unaccompanied Alien Children," press release, June 3, 2014.

[4] Kandel, W. 2017. Unaccompanied Alien Children: An Overview. Congressional Research Service. Washington, DC, https://fas.org/sgp/crs/homesec/R43599.pdf

[5] Unaccompanied Alien Children and Family Units Are Flooding the Border Because of Catch and Release Loopholes, https://www.dhs.gov/news/2018/02/15/unaccompanied-alien-children-and-family-units-are-flooding-border-because-catch-and

[6] See Letter from Barbara Pisaro Clark, Acting Assistant Secretary for Legislation, Department of Health and Human Services, to the Honorable Ron Johnson, Chairman, Senate Committee on Homeland Security and Governmental Affairs, June 21, 2017, https://www.hsgac.senate.gov/download/orr-response-to-sen-johnson.

[7] National Gang Center. 2016. Highlights of Gang-Related Legislation. Tallahassee, FL: Institution for Intergovernmental Research, National Gang Center, https://www.nationalgangcenter.gov/Legislation/Highlights.

Gangs continue to present unique challenges to individuals, the community, law enforcement, and service providers. For example, transnational criminal organizations (TCOs) or transnational gangs are often considered separate and distinct from traditional street gangs. Some of the distinctions between transnational gangs and other domestic street gangs include the fact that transnational gangs (1) tend to be criminally active and operational in more than one country; (2) are very mobile, highly adaptable to new geographic areas, and maintain connections in their native countries; and (3) may be characterized as gangs in which members in one country typically commit crimes that could have been substantially planned, directed, and controlled by the gang's leaders in another country.[8] [9]

Some of the more notable TCOs include Mara Salvatrucha (MS-13) and 18th St (M-18 or Calle 18). These TCOs have been known to forcefully recruit members from poor neighborhoods and secure confinements or prisons.[10] For example, in June 2017, it was reported that 39 of 138 UAC (28 percent) held in the custody of the Office of Refugee Resettlement secure facilities were involved with gangs.[11] For many of these youth, gangs offer an alternative path to obtain status, identity, protection, companionship, and respect than the traditional or legitimate life pathway affords.[12]

Research suggests that UAC may be more susceptible to gang membership because they are often alienated from legitimate social controls such as families, education systems, and prosocial community contexts when arriving in the United States.[13] Research also suggests that risk factors for gang membership span all five of the risk-factor domains of (1) family, (2) peer group, (3) school, (4) individual characteristics, and (5) community conditions.[14] There is a cumulative effect that increases the likelihood of gang membership as the youth experiences and is exposed to additional risk factors. Protective factors such as parental involvement and monitoring, family and peer support, and coping skills show promise in mitigating such risk factors. However, gang-involved youth in high-risk conditions will require additional resources and tools to overcome multiple risk factors.[15]

Focused deterrence and suppression strategies have proven effective to fight gang crime. Such approaches highlight the punishments or legal recourse that will result from the commission of a crime and discourage the person or group from committing crimes in the future.[16] [17] While many effective models use the full spectrum of gang control strategies (e.g., OJJDP Comprehensive

---

[8] Franco, C. 2010. The MS-13 and 18th Street Gangs: Emerging Transnational Gang Threats? CRS Report RL34233. Washington, DC: Congressional Research Service, Library of Congress.

[9] Seelke, C.R. 2016. Gangs in Central America. CRS Report for Congress 7-5700. Washington, DC: Congressional Research Service, Library of Congress.

[10] Seelke, C.R. 2016.

[11] See Letter from Barbara Pisaro Clark, Acting Assistant Secretary for Legislation, Department of Health and Human Services, to the Honorable Ron Johnson, Chairman, Senate Committee on Homeland Security and Governmental Affairs, June 21, 2017, https://www.hsgac.senate.gov/download/orr-response-to-sen-johnson.

[12] Wood. 2014. Understanding gang membership: The significance of group processes. *Group Processes & Intergroup Relations* 17(6):710–729.

[13] Marshall, B., Webb, B. and Tilley, N. 2005. Rationalisation of Current Research on Guns, Gangs and Other Weapons: Phase 1. London: Jill Dando Institute of Crime Science, University College London.

[14] Howell, J. 2005. Moving *Risk Factors into Developmental Theories of Gang Membership.*

[15] Stouthamer-Loeber, M., Loeber, R., Stallings, R., and Lacourse, E. 2008. Desistance from and persistence in offending. Violence and serious theft: Development and prediction from childhood to adulthood, 269–306.

[16] Braga and Weisburd. 2012. The effects of focused deterrence strategies on crime: A systematic review and meta-analysis of the empirical evidence. *Journal of Research in Crime and Delinquency* 49(3):323–358.

[17] Gravel, J., Bouchard, M., Descormiers, K., Wong, J.S., and Morselli, C. 2013. Keeping promises: A systematic review and a new classification of gang control strategies. *Journal of Criminal Justice* 4(1):228–242.

6

Gang Model) such as prevention, intervention, community mobilization, social intervention, and other holistic approaches, a variety of successful programs have reduced gang crime solely by enhancing their suppression efforts.

OJJDP FY 2018 Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children is part of the Project Safe Neighborhoods (PSN) suite of programs, which is focused on reducing violent crime. The PSN Suite comprises PSN, Strategies for Policing Innovation, Innovative Prosecution Solutions, Crime Gun Intelligence Centers, National Public Safety Partnerships, Technology Innovation for Public Safety, Encouraging Innovation: Field Initiated Programs, Innovations in Community-Based Crime Reduction, and Community Based Violence Prevention Demonstration Program. These initiatives will coordinate proactively with the PSN team in the district of the respective U.S. Attorney's Office (USAO) to enhance collaboration and strengthen commitment to reducing violent crime. Applicants must demonstrate this coordination with their USAO district PSN team in their submission.

**Statutory Authority:** This program is authorized pursuant to 34 U.S.C. 11171-11172 and the Department of Justice Appropriations Act, 2018, Pub. L. No. 115–141, 132 Stat. 348, 423.

**Project-Specific Information**

OJJDP's gang and youth violence prevention strategy is founded on the recognition that preventing and reducing gang crime and violence require a shared framework of strategic and coordinated delivery of programs, services, and practices across multiple sectors that balance community development, prevention, intervention, and targeted suppression and enforcement.

The Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children program is designed to reduce violent crime, gangs (specifically transnational gangs), and victimization and promote public safety in communities through implementation support for eligible communities that demonstrates their readiness to put a comprehensive strategic plan into action, based on a multilateral data-driven strategy.

**Goals, Objectives, and Deliverables**

The overall, long-term goals of the Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children program are to:

- Develop and implement a customized gang suppression strategy.
- Reduce and sustain reductions in community youth violence, particularly gang violence associated with UAC and TCOs.
- Share gang intelligence data with other law enforcement agencies.
- Prevent violence and promote healing from victimization and exposure to violence in the home, school, and community.
- Increase the safety, well-being, and healthy development of children, youth, and families.

OJJDP is seeking proposals from applicant jurisdictions that have high levels of youth-perpetrated gun crime and gang violence and that can demonstrate a willingness and readiness

to develop fully comprehensive community- and data-driven responses. Funding will support selected jurisdictions to undertake strategic planning and capacity-building work through multidisciplinary and community partnerships.

Because no one policy or program can completely or effectively respond to youth violence and victimization, OJJDP encourages communities to view the research-based principles set forth in Shared Framework for Reducing Youth Violence and Promoting Well Being[18] as a guide to stop violence and victimization. By addressing the individual, peer, family, community, and societal level factors; adopting trauma-informed and healing-based strategies; and building social capital and community efficacy in affected neighborhoods, localities can transform areas beset by violence into safe and thriving communities. OJJDP also continues to develop and enhance guidance around these types of strategies specifically, for example, through its prospective FY 2018 Initiative To Develop a Research-Based Youth Violence Prevention Practice Strategy. OJJDP expects to work with successful applicants across these related initiatives.

Applicants must propose and undertake their work through a collaboration of key stakeholders. The collaborative group must be led by law enforcement and include representation from prosecutors; the USAO and its PSN team; and city, county, and/or tribal leadership. It may include other key partners such as public health, education, courts, job and workforce development, housing, and community development agencies; faith-based organizations; or other community-based representation.

Applicants must demonstrate their knowledge of the federal process in which UAC are admitted into their jurisdiction via suitable placement or other sanctioned facilities. Applicants must be able to identify their key point of contact in the Office of Refugee Resettlement (ORR) to be able to obtain information regarding UAC who have self-disclosed or have been identified as having gang affiliation(s) or classified as a gang member. Applicants will include in their implementation plan the process their jurisdiction will take to maintain and safeguard such gang intelligence or information, as well as the transmission of new gang intelligence collected by the jurisdiction. The applicant will create protocols to establish the best method to securely transmit this information to ORR's Post Release Service.

Applicants must be able to demonstrate their knowledge of the jurisdiction-specific local gang problem. Such analysis would include, at a minimum, the ability to identify the number of gangs in the jurisdiction; the names and boundaries (if applicable) of the gangs in the jurisdiction; gang type and structures; known history of the gang (such as the longevity of the gang in the jurisdiction, mergers, and rivals); type of crimes the gang typically commits (if applicable); the jurisdiction's process for defining, identifying, and/or classifying the gang or its individual members (city code or state statute); and identifying all government entities that focus solely on gangs in the jurisdiction (i.e., gang task force, gang unit, etc.).

Applicants may consider using a gang or validated risk assessment tool, instrument, or questionnaire designed to aid in the identification of youth who are in a gang or are at risk of joining a gang.

---

[18] If you are unable to view the Shared Framework in Prezi, download this PDF document in narrative format for the content: https://www.ojjdp.gov/funding/Shared-Framework-for-Youth-Violence-Prevention.pdf.

Specific objectives and associated activities are:

1. **Develop and implement a customized gang suppression strategy.** Implement a customized gang suppression strategy equipped to address the unique challenges presented to local law enforcement and prosecutors.

2. **Stop gang violence and increase public safety.** Reduce and sustain reductions in community youth violence, particularly gang violence associated with UAC and UAC victimization. Prevent and intervene to deter youth ages 12 to 24 from gun and gang violence using evidence- and practice-based approaches, notably the OJJDP Comprehensive Gang Model; Group Violence Intervention, formerly known as the Boston Ceasefire model; and Cure Violence. (For more information on these approaches, refer to CrimeSolutions.gov and Gang Prevention: An Overview of Research and Programs.)

3. **Share gang intelligence data with applicable agencies.** Create information exchange protocols between local jurisdictions and other agencies, specifically ORR, to share information regarding UAC and their gang affiliations.

4. **Increase collaboration between law enforcement, prosecutors, and the USAO to enhance gang suppression strategies** to include the ever-changing nature of gangs, gang structure, and behaviors. Consult program examples such as those found in the PSN efforts.

5. **Reduce the impact of violence on youth, victims, and the community through law enforcement's development of intervention plans,** positive social contacts with target gang members, community mobilization efforts, and gang prevention activities focused on the target area(s).

Successful applicants are expected to demonstrate a high-need, high-capacity readiness to implement a detailed strategic plan and action plan to deliver reductions in youth violence through a coordinated and comprehensive approach involving prevention, intervention, trauma response, and enforcement in high-need areas. The successful applicants will demonstrate their ability to explicitly describe the jurisdiction's current gang landscape. This supports targeted implementation efforts for high-crime and high-capacity localities to enact proposed law enforcement-focused cross-sector, community-based approaches to youth violence in the community, particularly gang violence, through a range of new and coordinated targeted suppression and enforcement strategies, policies, and activities.

Accordingly, applicants are to submit, in their application, a detailed and comprehensive plan for implementation for OJJDP review and approval. This plan is to address two key components: (1) a collaborative strategic governance body and (2) a detailed 3-year implementation plan and budget.

More specifically, applicants will be required to produce the following deliverables for submission, feedback, and approval from OJJDP:

(1) A revised, final detailed 3-year implementation plan and budget, by the end of month 2, that incorporates any technical guidance and feedback provided by OJJDP during month 1. (Mid-course amendments and updates to the approved implementation plan may be

submitted to the program office for approval to accommodate any changes needed during the project period.)

(2) Establishment of a fully functioning collaborative strategic governance body, to include law enforcement and prosecutorial leaders and appropriate community-based organizational representation, charged to oversee the proposed initiative and assure its sustainability through long-range strategic planning.

(3) Implementation of a set of coordinated and targeted law enforcement strategies that result in a measurable reduction in gang activity.

(4) Establishment of a plan to securely transmit and receive information from ORR related to UAC and their gang affiliation(s).

All awardees will be required to submit semi-annual progress reports and performance measures data.

The Goals, Objectives and Deliverables are directly related to the performance measures that demonstrate the results of the work completed, as discussed in Section D. Application and Submission Information, under Program Narrative.

**Priority Considerations**

OJJDP will give priority consideration to applicants who demonstrate that their program will address unaccompanied alien children who are at risk for being introduced or indoctrinated into violent transnational criminal organizations or gangs (such as MS-13 or M-18) and also have high rates of gang crime and delinquency that have been attributed, in large part, to this population.

An applicant may receive priority consideration by explaining how it would address the problem area identified in its application through cooperation with immigration authorities, including compliance with 8 U.S.C. §§ 1373, 1644, and 1324, participation in a 287(g) or other cooperation program, honoring requests for notice of release, transfers of custody, and/or short term extensions of custody, and providing access to detention centers so federal immigration authorities may conduct interviews.[19]

If you choose to seek this priority consideration, please explain specifically how you believe these forms of cooperation will address the problem area you have identified, and how you will use these grants funds to achieve this end.

**Evidence-Based Programs or Practices**

OJP strongly emphasizes the use of data and evidence in policymaking and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates.

---

[19] To be clear, responses should focus on how cooperation with federal immigration authorities in their enforcement against *adults* will address gang recruitment of UACs.

- Integrating evidence into program, practice, and policy decisions within OJP and the field.
- Improving the translation of evidence into practice.

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention. Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based.

The OJP CrimeSolutions.gov website at https://www.crimesolutions.gov and the OJJDP Model Programs Guide website are two resources that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

**OJJDP training and technical assistance awardee standards.** OJJDP has developed the Core Performance Standards for Training, Technical Assistance, and Evaluation to promote among providers the consistency and quality of OJJDP-sponsored training and technical assistance and to advance common expectations of performance excellence. The standards present minimum expectations that providers must meet for effective practice in the planning, coordination, delivery, and evaluation of training. Award recipients must coordinate with OJJDP's National Training and Technical Assistance Center (NTTAC) in the assessment and delivery of services to ensure the effective use of OJJDP grant funding.

Requirements related to coordination of activities will include, but are not limited to:

- **Coordination with OJJDP NTTAC.** OJJDP requires all training and technical assistance projects to coordinate their activities with OJJDP NTTAC by complying with all OJJDP/NTTAC protocols to ensure coordinated delivery of services among providers and the effective use of OJJDP grant funding. OJJDP reserves the right to modify these protocols at any time with reasonable notice to the grantee prior to project completion.

- **OJJDP-funded webinars.** The award recipient must comply with OJJDP's Webinar Guidelines, as described in the core performance standards. Minimally, OJJDP training and technical assistance providers will submit information to OJJDP NTTAC in advance of all events for the online calendar, use the approved OJJDP presentation template, and record events and provide the final files which are compliant with Section 508 of the Workforce Rehabilitation Act to OJJDP or OJJDP's representative. For more information on Section 508 of the Workforce Rehabilitation Act, visit www.section508.gov.

- **Training information sharing.** OJP will collect information from its program offices on OJP-funded training and technical assistance events. Award recipients must use OJJDP's standard electronic training request form, submit information to NTTAC on all training events via the online TTA360 system (e.g., name of requestor, description of request, and dates of event) 30 days in advance of the event date, and report additional data, as OJJDP requires.

**Information Regarding Potential Evaluation of Programs and Activities**

The Department of Justice has prioritized the use of evidence-based programming and deems it critical to continue to build and expand the evidence informing criminal and juvenile justice programs to reach the highest level of rigor possible. Therefore, applicants should note that OJP may conduct or support an evaluation of the programs and activities funded under this solicitation. Recipients and subrecipients will be expected to cooperate with program-related assessments or evaluation efforts, including through the collection and provision of information or data requested by OJP (or its designee) for the assessment or evaluation of any activities and/or outcomes of those activities funded under this solicitation. The information or data requested may be in addition to any other financial or performance data already required under this program.

# B. Federal Award Information

OJJDP expects to make up to six awards of up to $1.2 million each, with an estimated total amount awarded of $7.2 million. OJJDP expects to make awards for a 3-year period of performance, to begin on April 1, 2019.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by law.

**Type of Award**

OJJDP expects to make any award under this solicitation in the form of a cooperative agreement, which is a type of award that provides for OJP to have substantial involvement in carrying out award activities. See Administrative, National Policy, and Other Legal Requirements, under Section F. Federal Award Administration Information, for a brief discussion of what may constitute substantial federal involvement.

All awardees under this solicitation are required to work collaboratively with OJJDP and the network of national technical assistance providers, research partners, and peer jurisdictions as well as federal partners, as directed by OJJDP. Additionally, all awardees will be required to collaborate to the maximum extent with relevant OJP initiatives funded in their jurisdictions, including but not limited to the prior OJJDP antigang strategy and youth violence projects noted above as well as the Bureau of Justice Assistance (BJA) Public Safety Partnerships and PSN initiatives to ensure there is no overlap of resources. OJJDP will consult with BJA in developing site selection recommendations.

**Financial Management and System of Internal Controls**
Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[20]) must, as described in the Part 200 Uniform Requirements[21] as set out at 2 C.F.R. 200.303:

---

[20] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to a subrecipient (subgrantee) to carry out part of the funded award or program. Additional information on proposed subawards is listed under What an Application Should Include, Section D of this solicitation.
[21] The "Part 200 Uniform Requirements" means the DOJ regulation at 2 C.F.R. Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

Establish and maintain effective internal control over the Federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(a) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

(b) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of Federal awards.

(c) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(d) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers sensitive consistent with applicable Federal, state, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand the applicable administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available at https://ojpfgm.webfirst.com/. (This training is required for all OJP award recipients.)

Also, applicants should be aware that OJP collects information from applicants on their financial management and systems of internal controls (among other information), which is used to make award decisions. Under Section D. Application and Submission Information, applicants may access and review a questionnaire – the OJP Financial Management and System of Internal Controls Questionnaire – that OJP requires **all** applicants (other than an individual applying in his/her personal capacity) to download, complete, and submit as part of the application.

**Budget Information**

**Cost Sharing or Match Requirement**

This solicitation does not require a match. However, if a successful application proposes a voluntary match amount, and OJP approves the budget, the total match amount incorporated into the approved budget becomes mandatory and subject to audit.

For additional information on cost sharing and match, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.3b.htm.

**Preagreement Costs (also known as Preaward Costs)**
Preagreement costs are costs incurred by the applicant prior to the start date of the period of performance of the federal award.

OJP does **not** typically approve preagreement costs; an applicant must request and obtain the prior written approval of OJP for all such costs. All such costs incurred prior to award and prior to approval of the costs are incurred at the sole risk of the applicant. (Generally, no applicant should incur project costs *before* submitting an application requesting federal funding for those costs.) Should there be extenuating circumstances that make it appropriate for OJP to consider approving preagreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for preagreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on Costs Requiring Prior Approval in the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm for more information.

**Limitation on Use of Award Funds for Employee Compensation; Waiver**
With respect to any award of more than $250,000 made under this solicitation, a recipient may not use federal funds to pay total cash compensation (salary plus cash bonuses) to any employee of the recipient at a rate that exceeds 110 percent of the maximum annual salary payable to a member of the federal government's Senior Executive Service (SES) at an agency with a Certified SES Performance Appraisal System for that year.[22] The 2018 salary table for SES employees is available on the Office of Personnel Management website at https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/18Tables/exec/html/ES.aspx. Note: A recipient may compensate an employee at a greater rate, provided the amount in excess of this compensation limitation is paid with nonfederal funds. (Nonfederal funds used for any such additional compensation will not be considered matching funds, where match requirements apply.) If only a portion of an employee's time is charged to an OJP award, the maximum allowable compensation is equal to the percentage of time worked times the maximum salary limitation.

The Assistant Attorney General for OJP may exercise discretion to waive, on an individual basis, this limitation on compensation rates allowable under an award. An applicant that requests a waiver should include a detailed justification in the budget narrative of its application. An applicant that does not submit a waiver request and justification with its application should anticipate that OJP will require the applicant to adjust and resubmit the budget.

The justification should address—in the context of the work the individual would do under the award—the particular qualifications and expertise of the individual, the uniqueness of a service the individual will provide, the individual's specific knowledge of the proposed program or project, and a statement that explains whether and how the individual's salary under the award would be commensurate with the regular and customary rate for an individual with his/her qualifications and expertise, and for the work he/she would do under the award.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm. OJP policy

---

[22] OJP does not apply this limitation on the use of award funds to the nonprofit organizations listed in Appendix VIII to 2 C.F.R. Part 200.

and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

**Costs Associated With Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

# C. Eligibility Information

For eligibility information, see the title page.

In addition, as discussed in more detail below, to the extent the applicant is a state or local government entity, in order for the applicant to validly accept this award, the chief legal officer of that entity must properly execute, and the applicant must submit, the specific certifications regarding compliance with certain federal laws. (Note: this requirement does not apply to Indian tribal governments.) (See Appendices D and E.)

For information on cost sharing or match requirements, see Section B. Federal Award Information.

# D. Application and Submission Information

**What an Application Should Include**

This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

Moreover, an applicant should anticipate that an application that OJP determines is nonresponsive to the scope of the solicitation, including the funding limit, or that OJP determines does not include the application elements that OJJDP has designated to be critical, will neither proceed to peer review nor receive further consideration. For this solicitation, OJJDP has designated the following application elements as critical: Program Narrative, Budget Detail Worksheet, and Budget Narrative.

**NOTE:** OJP has combined the Budget Detail Worksheet and Budget Narrative in a single document collectively referred to as the Budget Detail Worksheet. See "Budget Information and Associated Documentation" below for more information about the Budget Detail Worksheet and where it can be accessed.

*OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.*

Please review the "Note on File Names and File Types" under How To Apply to be sure applications are submitted in permitted formats.

1. **Information To Complete the Application for Federal Assistance (SF-424)**

   The SF-424 is a required standard form used as a cover sheet for submission of preapplications, applications, and related information. Grants.gov and the OJP Grants Management System (GMS) take information from the applicant's profile to populate the fields on this form. When selecting "type of applicant," if the applicant is a for-profit entity, select "For-Profit Organization" or "Small Business" (as applicable).

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. On the SF-424, current OJP award recipients, when completing the field for "Legal Name" (box 8a), should use the same legal name that appears on the prior year award document (which is also the legal name stored in OJP's financial system). Also, current recipients should enter the Employer Identification Number (EIN) in box 8b exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should submit a Grant Adjustment Notice (GAN) updating the information on its GMS profile prior to applying under this solicitation.

   A new applicant entity should enter its official legal name in box 8a, its address in box 8d, its EIN in box 8b, and its Data Universal Numbering System (DUNS) number in box 8c of the SF-424. A new applicant entity should attach official legal documents to its application (e.g., articles of incorporation, 501(c)(3) status documentation, organizational letterhead) to confirm the legal name, address, and EIN entered into the SF-424. OJP will use the System for Award Management (SAM) to confirm the legal name and DUNS number entered in the SF-424; therefore, an applicant should ensure that the information entered in the SF-424 matches its current registration in SAM. See the How to Apply section for more information on SAM and DUNS numbers.

   **Intergovernmental Review:** This solicitation ("funding opportunity") **is** subject to Executive Order 12372. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/wp-content/uploads/2017/11/Intergovernmental_-Review-_SPOC_01_2018_OFFM.pdf. If the state appears on the SPOC list, the applicant must contact the state SPOC to find out about, and comply with, the state's process under E.O. 12372. In completing the SF-424, an applicant whose state appears on the SPOC list is to make the appropriate selection in response to question 19 once the applicant has complied with its state E.O. 12372 process. (An applicant whose state does not appear on the SPOC list should answer question 19 by

selecting the response that the: "Program is subject to E.O. 12372 but has not been selected by the state for review.")

2. **Project Abstract**

Applications should include a high-quality project abstract that summarizes the proposed project in 400 words or less. Project abstracts should be—

- Written for a general public audience.
- Submitted as a separate attachment with "Project Abstract" as part of its file name.
- Single-spaced, using a standard 12-point font (such as Times New Roman) with 1-inch margins.

The abstract should briefly describe the project's purpose, the population to be served, and the activities that the applicant will implement to achieve the project's goals and objectives. The abstract should describe how the applicant will measure progress toward these goals. The abstract should indicate whether the applicant will use any portion of the project budget to conduct research, as described in Note on Project Evaluations on page 20.

As a separate attachment, the project abstract will **not** count against the page limit for the program narrative.

3. **Program Narrative**

Applicants must submit a program narrative that presents a detailed description of the purpose, goals, objectives, strategies, design, and management of the proposed program. The program narrative should be double-spaced with 1-inch margins, not exceeding 30 pages of 8½ by 11 inches, and use a standard 12-point font, preferably Times New Roman. Pages should be numbered "1 of 30," etc. The tables, charts, pictures, etc., including all captions, legends, keys, subtext, etc., may be single-spaced and will count in the 30-page limit. Material required under the Budget and Budget Narrative and Additional Attachments sections will not count toward the program narrative page count. Applicants may provide bibliographical references as a separate attachment that will not count toward the 30-page program narrative limit. If the program narrative fails to comply with these length-related restrictions, OJJDP may consider such noncompliance in peer review and in final award decisions.

The program narrative should address the following selection criteria: (1) description of the issue; (2) goals, objectives, and performance measures; (3) program design and implementation; and (4) capabilities/competencies. The applicant should clearly delineate the connections between and among each of these sections. For example, the applicant should derive the goals and objectives directly from the problems to be addressed. Similarly, the project design section should clearly explain how the program's structure and activities will accomplish the goals and objectives identified in the previous section.

The following sections should be included as part of the program narrative:[23]

---

[23] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

OJJDP-2018-13845

a. **Description of the Issue.** Applicants should briefly describe the nature and scope of the problem that the program will address (i.e., gang activity). The applicant should use data to provide evidence that the problem exists, demonstrate the size and scope of the problem, and document the effects of the problem on the targeted population and the larger community. Any data or research referenced in the narrative should include information about the source of the data and/or a citation. Applicants should describe the targeted population and any previous or current attempts to address the problem.

**Note:** Applicants **must** document and describe *a demonstrated need as measured by high levels of community violence, particularly youth-related gun crime and gang violence,* relative to national indices. The level of violence demonstrated is a factor in selection; therefore, applicants are to provide indicators or measures of the extent of the problem based on current local data derived from crime, justice, health, social service, education, and economic statistics and the comparison to national data. Applicants are specifically encouraged to provide a 5-year average violent crime rate for 2012 to 2016 and the percentage that the applicant jurisdiction's crime rate is over or under the national violent crime rate of 372.6 for 2016 (as released in the FBI's Uniform Crime Report in September 2017) and the jurisdiction's 5-year average homicide rate per 100,000 inhabitants for 2012 to 2016, as well as any firearms crime data and/or quantifiable evidence of gang-related violent crime. Applicants should also identify current community efforts and resources in place to address the problem as well as gaps and needs in the community.

Current research shows that population shifts are impacting rural and suburban communities as well, and understanding and accurately documenting the community problem is critical to addressing it. OJJDP is committed to supporting rural and suburban areas in this process and will give consideration of funding with appropriate documentation of crime and gang or group-related violent crime and clear analysis of the local community problem to describe the current need through the review criteria outlined on page 34 that are used in the peer review process. Applicants in rural and suburban areas are encouraged to reference the OJJDP Bulletin titled *Gangs in Small Towns and Rural Counties*.

Applicants should organize the information in this section as follows:

**Section One: 5-Year Average Violent Crime Rate Data and Geographical Map With ZIP Codes** as noted above. The geographic map should be included as a separate attachment.

**Section Two: Description of the Community and Targeted Area(s)**

1.  Describe the geographic area, size, and nature of the population and explain how and why the targeted community(ies) was identified and defined.
2.  Describe the community context, including the governmental structure and major agencies and community partners that currently exist.
3.  Provide a geographical map with ZIP Codes of targeted area(s).

**Section Three: Description of the Community Strengths, Gaps, and Needs**

1. Describe the crime and violence rates and other local data identified above related to the health, social service, education, justice, and economic statistics and the comparison to national data.
2. Provide local data on gang activity and gang crime patterns and describe the specific gang problem in the targeted area(s).
3. Describe the community strengths and resources, including current community leadership efforts as well as public resources and agency efforts.
4. Describe identified gaps and needs as defined by the community and the collaborative body overseeing the proposed strategic planning process.

b. **Goals, Objectives, and Performance Measures.** Applicants should describe the goals of the proposed program and identify its objectives. When formulating the program's goals and objectives, applicants should be cognizant of the performance measures that OJJDP will require successful applicants to provide.

**Goals.** Applicants should describe the program's intent to change, reduce, or eliminate the problem noted in the previous section and outline the project's goals.

**Program Objectives.** Applicants should explain how the program will accomplish its goals. Objectives are specific, quantifiable statements of the project's desired results. They should be clearly linked to the problem identified in the preceding section and measurable. (Examples of measurable objectives include the following: to reform and improve as many as 5 critical policies, to develop a data platform with indicators from 6 key agency sources, to implement new suppression activities to increase supervision and close monitoring of 40 known gang-involved youth, or to invest in economic and employment opportunities to provide jobs for 50 high-risk youth.)

**Performance Measures.** OJP will require each successful applicant to submit regular performance data that demonstrate the results of the work carried out under the award (see "General Information About Post-Federal Award Reporting Requirements" in Section F. Federal Award Administration Information). The performance data directly relate to the goals, objectives, and deliverables identified under "Goals, Objectives, and Deliverables" in Section A. Program Description.

Applicants should visit OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.

Performance measures for this solicitation are listed in Appendix A: Performance Measures Table.

The application should demonstrate the applicant's understanding of the performance data reporting requirements for this grant program and detail how the applicant will gather the required data should it receive funding.

Please note that applicants are **not** required to submit performance data with the application. Performance measures information is included as an alert that successful

19

applicants will be required to submit performance data as part of the reporting requirements under an award.

OJJDP will require award recipients to submit semiannual performance metrics of relevant data through the Data Reporting Tool.

**Note on Project Evaluations**
An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing, and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the protection of human subjects" section of the "Requirements related to Research" webpage of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards," available through the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that webpage.

c. **Project Design and Implementation.** Applicants should detail how the project will operate throughout the funding period and describe the strategies that they will use to achieve the goals and objectives identified in the previous section. Applicants should describe how they will complete the deliverables stated in the Goals, Objectives, and Deliverables section on page 7. OJJDP encourages applicants to select evidence-based practices for their programs.

Applicants must submit in their application for OJJDP review and approval a detailed and comprehensive plan ready for implementation. Implementation awardees are expected to have already engaged in some collaborative strategic planning and be prepared to describe and discuss this strategic plan tied directly to a detailed 3-year implementation plan that implements a coordinated and balanced range of strategies, policies, and activities that include prevention, intervention, and enforcement. This implementation plan should also detail the specific activities and action steps necessary

to advance the ongoing assessment and tracking of the gang and youth violence problem.

Applicants must also identify a lead agency, staffing to include a dedicated project coordinator and a gang specialist as key personnel, capacity and sustainability activities, and known training and technical assistance needs.

This section should also include details regarding any leveraged resources (cash or in-kind) from local sources to support the project and discuss plans for sustainability beyond the grant period.

In addition, an applicant may receive priority consideration by explaining how it would address the problem area identified in its application through cooperation with federal immigration authorities, including compliance with 8 USC §§ 1373, 1644, and 1324, participation in a 287 (g) or other cooperation program, honoring requests for notice of release, transfers of custody, and/or short term extensions of custody, and providing access to detention centers so federal immigration authorities may conduct interviews.

If you choose to seek this priority consideration, please explain specifically how you believe these forms of cooperation will address the problem area you have identified, and how you will use these grants funds to achieve this end.

**Logic Model.** Applicants should include a logic model that graphically illustrates how the performance measures are related to the project's problems, goals, objectives, and design. See sample logic models here. Applicants should submit the logic model as a separate attachment, as stipulated in Additional Attachments, page 28.

**Timeline.** Applicants should submit a realistic timeline or milestone chart that indicates major tasks associated with the goals and objectives of the project, assigns responsibility for each, and plots completion of each task by month or quarter for the duration of the award, using "Year 1," "Month 1," "Quarter 1," etc., not calendar dates (see "Sample Project Timelines" here).

Applicants should submit the timeline as a separate attachment, as stipulated in Additional Attachments, page 28. On receipt of an award, the recipient may revise the timeline, based on training and technical assistance that OJJDP will provide.

d. **Capabilities and Competencies.** This section should describe the experience and capability of the applicant organization and any contractors or subgrantees that the applicant will use to implement and manage this effort and its associated federal funding, highlighting any previous experience implementing projects of similar design or magnitude. Applicants should highlight their experience/capability/capacity to manage subawards, including details on their system for fiscal accountability. Management and staffing patterns should be clearly connected to the project design described in the previous section. Applicants should describe the roles and responsibilities of project staff and explain the program's organizational structure and operations. Applicants should include a copy of an organizational chart showing how the organization operates, including who manages the finances; how the organization manages subawards, if there are any; and the management of the project proposed for funding. Requirements for

staffing include a dedicated project coordinator and a gang specialist as noted above on page 21.

Applicants must demonstrate a history and/or readiness to lead collaborative communitywide strategic efforts consistent with the size and scope of this project. Applicants are to include relevant material to demonstrate this history and readiness in this section or, as an option, they may attach the information as an appendix (Evidence of Collaborative History and Readiness) to their application.

**Letters of Support/Memoranda of Understanding.** Applicants are required to submit signed letters or memoranda of understanding that document the scope and nature of each stakeholder's commitment to the collaborative work proposed. At a minimum, a memorandum of understanding must be articulated between the law enforcement agency applying for the funds and a prosecutorial agency. Please note that each agency in the memorandum of understanding maintains independence as an agency but is agreeing to focus on gang-related crime to maximize public safety and hold offenders accountable using a collaborative and data-driven approach.

A letter of support from the Office of the Assistant U.S. Attorney is also required, for purposes of meeting basic minimum requirements in response to this solicitation. Letters of support may be addressed to the OJJDP Administrator. Only letters of support that are submitted by the due date and with the full application will be considered during the review process.

## 4. Budget and Associated Documentation

The Budget Detail Worksheet and the Budget Narrative are now combined in a single document collectively referred to as the Budget Detail Worksheet. The Budget Detail Worksheet is a user-friendly, fillable, Microsoft Excel-based document designed to calculate totals. Additionally, the Excel workbook contains worksheets for multiple budget years that can be completed as necessary. **All applicants should use the Excel version when completing the proposed budget in an application, except in cases where the applicant does not have access to Microsoft Excel or experiences technical difficulties.** If an applicant does not have access to Microsoft Excel or experiences technical difficulties with the Excel version, then the applicant should use the 508-compliant accessible Adobe Portable Document Format (PDF) version.

Both versions of the Budget Detail Worksheet can be accessed at https://ojp.gov/funding/Apply/Forms/BudgetDetailWorksheet.htm.

Applicants are to set aside $120,000 in funding (or 10 percent of the award) to support local training needs, including support for the strategic planning and systems improvement processes to be undertaken. During the project period, successful program site applicants should be prepared to work with an OJJDP-designated national training and technical assistance (TTA) provider to assess local TTA needs and complete a long-range capacity-building plan as part of the strategic plan deliverable.

Finally, applicants are to allocate a portion of the $120,000 mentioned above for travel to attend two to three multiday national grantee meetings and workshops in Washington, DC, for up to four individuals as directed by OJJDP. Applicants should budget approximately

$2,000 per person to attend the meetings and record this as part of the travel line item in the budget. The Office of the Chief Financial Officer requires cost calculations for all line items in the budget, including this required travel. The cost breakdown should include airfare, per diem rate, lodging, number of travelers, number of days, etc. (for example, 2 people x airline ticket ($400) = $800; 2 people x 2 days per diem ($71/day) = $284, 2 people x lodging ($207) x 2 nights = $828). Use U.S. General Services Administration per diem rates.

a. **Budget Detail Worksheet**

The Budget Detail Worksheet should provide the detailed computation for each budget line item, listing the total cost of each and showing how it was calculated by the applicant. For example, costs for personnel should show the annual salary rate and the percentage of time devoted to the project for each employee paid with grant funds. The Budget Detail Worksheet should present a complete itemization of all proposed costs.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide at https://ojp.gov/financialguide/DOJ/index.htm.

b. **Budget Narrative**

The budget narrative should thoroughly and clearly describe every category of expense listed in the Budget Detail Worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities).

An applicant should demonstrate in its budget narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the goals of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The budget narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the budget narrative should describe costs by year.

c. **Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**

Applicants for OJP awards typically may propose to make *subawards*. Applicants also may propose to enter into procurement *contracts* under the award.

Whether an action—for federal grants administrative purposes—is a subaward or procurement contract is a critical distinction, as significantly different rules apply to subawards and procurement contracts. If a recipient enters into an agreement that is a subaward of an OJP award, specific rules apply—many of which are set by federal statutes and DOJ regulations; others by award conditions. These rules place particular

23

responsibilities on an OJP recipient for any subawards the OJP recipient may make. The rules determine much of what the written subaward agreement itself must require or provide. The rules also determine much of what an OJP recipient must do both before and after it makes a subaward. If a recipient enters into an agreement that is a procurement contract under an OJP award, a substantially different set of federal rules applies.

OJP has developed the following guidance documents to help clarify the differences between subawards and procurement contracts under an OJP award and outline the compliance and reporting requirements for each. This information can be accessed online at https://ojp.gov/training/training.htm.

- Subawards under OJP Awards and Procurement Contracts under Awards: A Toolkit for OJP Recipients.
- Checklist to Determine Subrecipient or Contractor Classification.
- Sole Source Justification Fact Sheet and Sole Source Review Checklist.

In general, the central question is the relationship between what the third party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or will conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a *subaward* for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other nonfederal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement—for purposes of federal grants administrative requirements—is a *subaward* or is instead a procurement *contract* under an award. The substance of the relationship should be given greater consideration than the form of agreement between the recipient and the outside entity.

## 1. Information on proposed subawards and required certifications regarding certain federal laws from certain subrecipients

A recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) subawards, a recipient must have authorization from OJP before it may make a subaward.

A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the Program Narrative, Budget Detail Worksheet, and Budget Narrative as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation, and is not approved by OJP, the recipient will be required, post-award, to request and obtain written authorization from OJP before it may make the subaward.

If an applicant proposes to make one or more subawards to carry out the federal award and program, the applicant should (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative, but also in the Budget Detail Worksheet and Budget Narrative.

***Required certifications generally relating to various federal statutes.*** Before an applicant may subaward FY 2018 award funds to a unit of local government or to a public institution of higher education, it will be required (by specific award condition, the terms of which will govern) to obtain a properly-executed certification, generally relating to various specific federal laws from the proposed subrecipient. (This requirement regarding these federal laws will not apply to subawards to tribal agencies or governments). The specific certification the recipient must require from a unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at the link listed below.

- https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm

## 2. Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)

Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317–200.326). The Budget Detail Worksheet and Budget Narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. All noncompetitive (sole source) procurement contracts must meet the OJP requirements outlined at https://ojp.gov/training/subawards-procurement.htm. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition unless and until the recipient receives specific advance authorization from OJP to use a noncompetitive approach for the procurement. An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition.

If the applicant receives an award, sole source procurements that do not exceed the Simplified Acquisition Threshold (currently, $150,000) must have written justification for

the noncompetitive procurement action maintained in the procurement file. If a procurement file does not have the documentation that meets the criteria outlined in 2 C.F.R. 200, the procurement expenditures may not be allowable. Sole source procurement over the $150,000 Simplified Acquisition Threshold must have prior approval from OJP using a Sole Source GAN. Written documentation justifying the noncompetitive procurement must be submitted with the GAN and maintained in the procurement file.

**d. Preagreement Costs**

For information on preagreement costs, see Section B. Federal Award Information.

**5. Indirect Cost Rate Agreement (if applicable)**

Indirect costs may be charged to an award only if:

(a) The recipient has a current (unexpired) federally approved indirect cost rate; or
(b) The recipient is eligible to use, and elects to use, the *de minimis* indirect cost rate described in the Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

An applicant with a current (unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, contact the Office of the Chief Financial Officer Customer Service Center at 800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at https://www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the *de minimis* indirect cost rate. An applicant that is eligible to use the *de minimis* rate and that wishes to use the *de minimis* rate should attach written documentation to the application that advises OJP of both (1) the applicant's eligibility to use the *de minimis* rate and (2) its election to do so. If an eligible applicant elects the *de minimis* rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The *de minimis* rate may no longer be used once an approved federally negotiated indirect cost rate is in place. (No entity that ever has had a federally approved negotiated indirect cost rate is eligible to use the *de minimis* rate.) For the "de minimis" rate requirements (including information on eligibility to elect to use the rate), see the Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

**6. Tribal Authorizing Resolution (if applicable)**

A tribe, tribal organization, or third party that proposes to provide direct services or assistance to residents on tribal lands should include in its application a resolution, letter, affidavit, or other documentation, as appropriate, that demonstrates (as a legal matter) that the applicant has the requisite authorization from the tribe(s) to implement the proposed project on tribal lands. In those instances when an organization or consortium of tribes applies for an award on behalf of a tribe or multiple specific tribes, the application should include appropriate legal documentation, as described above, from all tribes that would receive services or assistance under the award. A consortium of tribes for which existing consortium bylaws allow action without support from all tribes in the consortium (i.e., without an authorizing resolution or comparable legal documentation from each tribal governing body) may submit, instead, a copy of its consortium bylaws with the application.

An applicant unable to submit an application that includes a fully-executed (i.e., signed) copy of legal appropriate documentation, as described above, consistent with the applicable tribe's governance structure, should, at a minimum, submit an unsigned, draft version of such legal documentation as part of its application (except for cases in which, with respect to a tribal consortium applicant, consortium bylaws allow action without the support of all consortium member tribes). If selected for funding, OJP will make use of and access to award funds contingent on receipt of the fully-executed legal documentation.

7. **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**

Every OJP applicant (other than an individual applying in his or her personal capacity) is required to download, complete, and submit the OJP Financial Management and System of Internal Controls Questionnaire (questionnaire) at https://ojp.gov/funding/Apply/Resources/FinancialCapability.pdf as part of its application. The questionnaire helps OJP assess the financial management and internal control systems, and the associated potential risks of an applicant as part of the preaward risk assessment process.

The questionnaire should only be completed by financial staff most familiar with the applicant's systems, policies, and procedures in order to ensure that the correct responses are recorded and submitted to OJP. The responses on the questionnaire directly impact the preaward risk assessment and should accurately reflect the applicant's financial management and internal controls system at the time of the application. The preaward risk assessment is only one of multiple factors and criteria used in determining funding. However, a preaward risk assessment that indicates that an applicant poses a higher risk to OJP may affect the funding decision and/or result in additional reporting requirements, monitoring, special conditions, withholding of award funds, or other additional award requirements.

Among other things, the form requires each applicant to disclose whether it currently is designated "high risk" by a federal grant-making agency outside of DOJ. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

- The federal awarding agency that currently designates the applicant high risk.

- The date the applicant was designated high risk.
- The high-risk point of contact at that federal awarding agency (name, phone number, and email address).
- The reasons for the high-risk status, as set out by the federal awarding agency.

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

## 8. Disclosure of Lobbying Activities

Each applicant must complete and submit this information. An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form Disclosure of Lobbying Activities (SF-LLL) at https://ojp.gov/funding/Apply/Resources/Disclosure.pdf. An applicant that does not expend any funds for lobbying activities is to enter "N/A" in the text boxes for item 10 ("a. Name and Address of Lobbying Registrant" and "b. Individuals Performing Services").

## 9. Certification of Compliance by the Chief Legal Officer of the Applicant Agency or Jurisdiction[24]

To the extent that the applicant is either a state or a local government entity, then the chief legal officer of that applicant (e.g., the Attorney General of the State) is to carefully review the certifications attached as Appendices D and E to this solicitation. If the chief legal officer determines that he or she may execute the certifications, the applicant is to submit the certifications as part of its application. (Note: this requirement does not apply to tribal governments.)

As discussed further below, an applicant that is either a state or local government will be *unable to make a valid award acceptance* of an FY 2018 award under this solicitation unless and until a properly-executed certification by its chief legal officer is received by OJP on or before the day the applicant submits an executed award.

## 10. Additional Attachments

Applicants should submit the following information, as stipulated in the cited pages, as attachments to their applications. While the materials listed below are not assigned specific point values, peer reviewers will, as appropriate, consider these items when rating applications. For example, reviewers will consider résumés and/or letters of support/

---

[24] The certifications found in Appendices D and E and the responses to the questions regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE) (Appendix C) are not required where the selected applicant or any selected subrecipient is either a tribal government/organization, a non-profit organization, or a private institution of higher education. If the selected applicant or any selected subrecipient is a public institution of higher education, contact the NCJRS Response Center (see "Contact Information," page 2) for additional guidance concerning compliance with the identified federal laws.

memoranda of understanding when assessing "capabilities/competencies." Peer reviewers will not consider any additional information that the applicant submits other than that specified below.

a) **Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE).**

Each applicant must provide responses to the following questions as an attachment to the application:

1. Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?
2. Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?
3. If yes to either:
   o   Please provide a copy of each law or policy;
   o   Please describe each practice; and
   o   Please explain how the law, policy, or practice complies with section 1373

See Appendix C for a template that applicants may use to prepare this attachment.

b) **Applicant Disclosure of Pending Applications**
Each applicant is to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation and (2) would cover any identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to state agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

• The federal or state funding agency.
• The solicitation name/project name.
• The point of contact information at the applicable federal or state funding agency.

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|

SAMPLE

OJJDP-2018-13845

| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| Health and Human Services/Substance Abuse and Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant's legal name on the application must match the entity named on the disclosure of pending applications statement.

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover any identical cost items outlined in the budget submitted as part of this application."

c) Logic model (see page 21).

d) Timeline or milestone chart (see page 21).

e) Résumés of all key personnel.

f) Job descriptions outlining roles and responsibilities for all key positions.

g) Letters of support/memoranda of understanding from partner organizations (see page 22).

h) Evidence of history and organizational readiness to lead collaborative, communitywide strategic efforts consistent with the size and scope of this project, either as an appendix or in the Capabilities and Competencies section (see page 21).

i) Geographical map of targeted areas with ZIP Codes (see page 18).

**How To Apply**

Applicants must register in and submit applications through Grants.gov, a primary source to find federal funding opportunities and apply for funding. Find complete instructions on how to register and submit an application at https://www.grants.gov/web/grants/support.html. Applicants that experience technical difficulties during this process should call the Grants.gov Customer Support Hotline at **800–518–4726** or **606–545–5035**, which operates 24 hours a day, 7 days a week, except on federal holidays.

**Important Grants.gov update.** Grants.gov has updated its application tool. The legacy PDF application package was retired on December 31, 2017. Grants.gov Workspace is now the standard application method for applying for grants. OJP applicants should familiarize themselves with the Workspace option now. For complete information and instructions on using Workspace (and other changes), go to the Workspace Overview page at https://www.grants.gov/web/grants/applicants/workspace-overview.html.

Registering with Grants.gov is a one-time process; however, **processing delays may occur, and it can take several weeks** for first-time registrants to receive confirmation of registration and a user password. OJP encourages applicants to **register several weeks before** the application submission deadline. In addition, OJP urges applicants to submit applications at least 72 hours prior to the application due date to allow time for the applicant to receive validation messages or rejection notifications from Grants.gov, and to correct in a timely fashion any problems that may have caused a rejection notification.

OJP strongly encourages all prospective applicants to sign up for Grants.gov email notifications regarding this solicitation at https://www.grants.gov/web/grants/manage-subscriptions.html. If this solicitation is cancelled or modified, individuals who sign up with Grants.gov for updates will be automatically notified.

**Browser Information:** Grants.gov was built to be compatible with Internet Explorer. For technical assistance with Google Chrome or another browser, contact Grants.gov Customer Support.

**Note on Attachments:** Grants.gov has two categories of files for attachments: "mandatory" and "optional." OJP receives all files attached in both categories. Attachments are also labeled to describe the file being attached (e.g., Project Narrative, Budget Narrative, Other). Applicants should ensure that all required documents are attached in the correct Grants.gov category and are labeled correctly. Do not embed "mandatory" attachments within another file.

**Note on File Names and File Types:** Grants.gov only permits the use of certain specific characters in the file names of attachments. Valid file names may include only the characters shown in the table below. Grants.gov rejects any application that includes an attachment(s) with a file name that contains any characters not shown in the table below. Grants.gov forwards successfully submitted applications to the OJP Grants Management System (GMS).

| Characters |
| --- |
| Upper case (A – Z) |
| Lower case (a – z) |
| Underscore (__) |

| Special Characters | | |
|---|---|---|
| Parenthesis ( ) | Curly braces { } | Square brackets [ ] |
| Ampersand (&)* | Tilde (~) | Exclamation point (!) |
| Comma ( , ) | Semicolon ( ; ) | Apostrophe ( ' ) |
| At sign (@) | Number sign (#) | Dollar sign ($) |
| Percent sign (%) | Plus sign (+) | Equal sign (=) |

| Characters |
|---|
| Hyphen ( - ) |
| Space |
| Period (.) |

**\*When using the ampersand (&) in XML, applicants must use the "&amp;" format.**

**GMS does not accept executable file types as application attachments.** These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip." GMS may reject applications with files that use these extensions. It is important to allow time to change the type of file(s) if the application is rejected.

All applicants are required to complete the following steps:

**Unique Entity Identifier (DUNS Number) and System for Award Management**
Every applicant entity must comply with all applicable SAM and unique entity identifier (currently, a DUNS number) requirements. SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. More detailed information about SAM and the DUNS number is in the numbered sections below.

If an applicant entity has not fully complied with the applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

**Registration and Submission Steps**

1. **Acquire a unique entity identifier (currently, a DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

   This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at http://www.dnb.com/. A DUNS number is usually received within 2 business days.

2. **Acquire or maintain registration with SAM.** Any applicant for an OJP award creating a **new** entity registration (or updating or renewing a registration) in SAM.gov must submit an original, signed notarized letter appointing the authorized Entity Administrator within thirty (30) days of the registration activation. ***Notarized letters must be submitted via U.S. Postal Service Mail.*** *Read the Alert at www.sam.gov to learn more about what is required in the notarized letter, and read the Frequently Asked Questions (FAQs) at www.gsa.gov/samupdate to learn more about this process change.* All applicants for OJP awards (other than individuals) must maintain current registrations in the SAM database.

Applicants will need the authorizing official of the organization and an Employer Identification Number (EIN). Information about SAM registration procedures can be accessed at www.sam.gov.

An application cannot be successfully submitted in Grants.gov until Grants.gov receives the SAM registration information. Once the SAM registration/renewal is complete, **the information transfer from SAM to Grants.gov can take as long as 48 hours.** OJP recommends that the applicant register or renew registration with SAM as early as possible.

3.  **Acquire an Authorized Organization Representative (AOR) and a Grants.gov username and password.** Complete the AOR profile on Grants.gov and create a username and password. An applicant entity's "unique entity identifier" (DUNS number) must be used to complete this step. For more information about the registration process for organizations and other entities, go to https://www.grants.gov/web/grants/applicants/organization-registration.html.

4.  **Acquire confirmation for the AOR from the E-Business Point of Contact (E-Biz POC).** The E-Biz POC at the applicant organization must log into Grants.gov to confirm the applicant organization's AOR. The E-Biz POC will need the Marketing Partner Identification Number (MPIN) password obtained when registering with SAM to complete this step. Note that an organization can have more than one AOR.

5.  **Search for the funding opportunity on Grants.gov.** Use the following identifying information when searching for the funding opportunity on Grants.gov. The Catalog of Federal Domestic Assistance (CFDA) numbers for this solicitation are 16.544, titled "Youth Gang Prevention," and 16.123, titled "Community-Based Violence Prevention Program." The funding opportunity number is OJJDP-2018-13845.

6.  **Access funding opportunity and application package from Grants.gov.** Select "Apply for Grants" under the "Applicants" column. Enter your email address to be notified of any changes to the opportunity package before the closing date. Click the Workspace icon to use Grants.gov Workspace.

7.  **Submit a valid application consistent with this solicitation by following the directions** in Grants.gov. Within 24–48 hours after submitting the electronic application, the applicant should receive two notifications from Grants.gov. The first will confirm the receipt of the application. The second will state whether the application has been validated and successfully submitted, or whether it has been rejected due to errors, with an explanation. It is possible to first receive a message indicating that the application is received, and then receive a rejection notice a few minutes or hours later. Submitting an application well ahead of the deadline provides time to correct the problem(s) that caused the rejection. **Important:** OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date, to allow time to receive validation messages or rejection notifications from Grants.gov, and to correct in a timely fashion any problems that may have caused a rejection notification. Applications must be successfully submitted through Grants.gov by 11:59 p.m. ET on October 04, 2018.

Go to https://www.grants.gov/web/grants/applicants/organization-registration.html for further details on DUNS numbers, SAM, and Grants.gov registration steps and timeframes.

**Note: Application Versions**
If an applicant submits multiple versions of the same application, OJP will review <u>only</u> the most recent system-validated version submitted.

**Experiencing Unforeseen Grants.gov Technical Issues**

An applicant that experiences unforeseen Grants.gov technical issues beyond its control that prevent it from submitting its application by the deadline must contact the Grants.gov Customer Support Hotline at https://www.grants.gov/web/grants/support.html or the SAM Help Desk (Federal Service Desk) at https://www.fsd.gov/fsd-gov/home.do to report the technical issue and receive a tracking number. The applicant must email the Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any Grants.gov Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the Grants.gov or SAM Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions:

- Failure to register in SAM or Grants.gov in sufficient time. (SAM registration and renewal can take as long as 10 business days to complete. The information transfer from SAM to Grants.gov can take up to 48 hours.)
- Failure to follow Grants.gov instructions on how to register and apply as posted on its website.
- Failure to follow each instruction in the OJP solicitation.
- Technical issues with the applicant's computer or information technology environment, such as issues with firewalls or browser incompatibility.

**Notifications regarding known technical problems with Grants.gov, if any, are posted at the top of the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.**

# E. Application Review Information

**Review Criteria**

Applications that meet basic minimum requirements will be evaluated by peer reviewers using the following review criteria.

1. Description of the Issue (15%)
2. Goals, Objectives, and Performance Measures (5%)
3. Project Design and Implementation (40%)

4. Capabilities and Competencies (35%): Applicants must demonstrate coordination with their USAO district PSN team in their submission
5. Budget (5%): complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). Budget narratives should demonstrate generally how applicants will maximize cost effectiveness of grant expenditures. Budget narratives should demonstrate cost effectiveness in relation to potential alternatives and the goals of the project.[25]

See What an Application Should Include, page 16, for the criteria that the peer reviewers will use to evaluate applications. Please refer to the priority consideration for projects that work effectively with DHS/ICE, see page 10.

**Review Process**

OJP is committed to ensuring a fair and open process for making awards. OJJDP reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation.

Peer reviewers will review the applications submitted under this solicitation that meet basic minimum requirements. For purposes of assessing whether an application meets basic minimum requirements and should proceed to further consideration, OJP screens applications for compliance with those requirements. Although specific requirements may vary, the following are common requirements applicable to all solicitations for funding under OJP programs:

- The application must be submitted by an eligible type of applicant.
- The application must request funding within programmatic funding constraints (if applicable).
- The application must be responsive to the scope of the solicitation.
- The application must include all items designated as critical elements.
- The applicant must not be identified in SAM as excluded from receiving federal awards.

For a list of the critical elements for this solicitation, see "What an Application Should Include" under Section D. Application and Submission Information.

Peer review panels will evaluate, score, and rate applications that meet basic minimum requirements. OJJDP may use internal peer reviewers, external peer reviewers, or a combination, to assess applications on technical merit using the solicitation's review criteria. An external peer reviewer is an expert in the subject matter of a given solicitation who is not a current DOJ employee. An internal reviewer is a current DOJ employee who is well-versed or has expertise in the subject matter of this solicitation. Peer reviewers' ratings and any resulting recommendations are advisory only, although reviewer views are considered carefully. Other important considerations for OJJDP include geographic diversity, strategic priorities, and available funding, as well as the extent to which the budget detail worksheet and budget narrative accurately explain project costs that are reasonable, necessary, and otherwise allowable under federal law and applicable federal cost principles.

---

[25] Generally speaking, a reasonable cost is a cost that, in its nature or amount, does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs.

Pursuant to the Part 200 Uniform Requirements, before award decisions are made, OJP also reviews information related to the degree of risk posed by the applicant. Among other things to help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award.

In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the nonpublic segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)).

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant.

The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants for competitive awards. OJP takes into account information pertinent to matters such as—

1. Applicant financial stability and fiscal integrity.
2. Quality of the applicant's management systems, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide.
3. Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies.
4. Reports and findings from audits of the applicant, including audits under the Part 200 Uniform Requirements.
5. Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements.

Absent explicit statutory authorization or written delegation of authority to the contrary, all final award decisions will be made by the Assistant Attorney General, who may take into account not only peer review ratings and OJJDP recommendations, but also other factors as indicated in this section.

# F. Federal Award Administration Information

**Federal Award Notices**

Award notifications will be made by March 29, 2019. OJP sends award notifications by email through GMS to the individuals listed in the application as the point of contact and the authorizing official (E-Biz POC and AOR). The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9 p.m. ET on the award date.

For each successful applicant, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances;

designate a financial point of contact; thoroughly review the award, including all award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning and submission of the fully executed award document to OJP.

**NOTE:** In order validly to accept an award under this program, an applicant must submit to GMS the certifications by its chief legal officer regarding compliance with certain federal laws, executed using the forms that appear in Appendices D and E. (The forms also may be downloaded at the link listed below)

- https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm

Unless the executed certification either— (1) is submitted to OJP together with the signed award document, or (2) is uploaded in GMS no later than the day the signed award document is submitted, **OJP will reject as invalid** any signed acceptance, until such time as the certifications are submitted.

**Administrative, National Policy, and Other Legal Requirements**

If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award conditions, as well as all applicable requirements of federal statutes and regulations (including applicable requirements referred to in the assurances and certifications executed in connection with award acceptance). OJP strongly encourages prospective applicants to review information on post-award legal requirements and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards," available in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents before it may receive any award funds. (An applicant is not required to submit these documents as part of an application.)

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

- Certified Standard Assurances

The webpages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2018. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

As stated above, OJJDP expects that it will make any award under this solicitation in the form of a cooperative agreement. Cooperative agreements include a condition in the award document

that sets out the nature of the "substantial federal involvement" in carrying out the award and program. Generally stated, under OJP cooperative agreement awards, responsibility for the day-to-day conduct of the funded project rests with the recipient. OJP, however, may have substantial involvement in matters such as substantive coordination of technical efforts and site selection, as well as review and approval of project work plans, research designs, data collection instruments, and major project-generated materials. In addition, OJP often indicates in the award terms and conditions that it may redirect the project if necessary.

In addition to an award condition that sets out the nature of the anticipated "substantial federal involvement" in the award, cooperative agreements awarded by OJP include an award condition that requires specific reporting in connection with conferences, meetings, retreats, seminars, symposia, training activities, or similar events funded under the award.

OJJDP's role will include the following tasks:

- Reviewing and approving major work plans, including changes to such plans, and key decisions pertaining to project operations.

- Reviewing and approving major project-generated documents and materials used to provide project services.

- Providing guidance in significant project planning meetings and participating in project-sponsored training events or conferences.

- Reviewing and approving key personnel changes.

**Express Award Conditions**
Individual FY 2018 awards made pursuant to this solicitation will, as appropriate and to the extent consistent with law, include conditions that will require the recipient (and any subrecipient) that accepts the award to do various things, with respect to the "program or activity" that would receive federal financial assistance thereunder. **Although the specific terms of each of those conditions are what will govern the awards**, included among such conditions will be some that, **generally speaking**, will require the recipient (and any subrecipient) that accepts the award to do some or all of the following:

- Not to violate 8 U.S.C. § 1373 (prohibiting restrictions on—
    (1) communication to/from the Department of Homeland Security ("DHS") of information regarding the citizenship or immigration status of any individual; and
    (2) maintaining, or exchanging with any government entity, information regarding the immigration status of any individual).
- Not to violate 8 U.S.C. § 1644 (prohibiting restrictions on communication to/from DHS of information regarding the immigration status of an alien)

- Not to violate, or aid or abet any violation of,
    8 U.S.C. § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal, harbor, or shield from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts … "or aid or abet the

commission of any of the preceding acts")

- Not to impede the exercise of the authority of the federal government under 8 U.S.C. § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released") or 8 U.S.C. § 1231 (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.  (Note:  This condition will apply only with respect to alien adult detainees and only in jurisdictions where law enforcement is assisting in implementing this program.)

- Not to impede the exercise by DHS agents, "anywhere in or outside the United States" (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," specifically by requiring such recipients to permit DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States.(Note:  This condition will apply only with respect to alien adult detainees and only in jurisdictions where law enforcement is assisting in implementing this program.)

**General Information About Post-Federal Award Reporting Requirements**

In addition to the deliverables described in Section A. Program Description, any recipient of an award under this solicitation will be required to submit the following reports and data.

Required reports. Recipients typically must submit quarterly financial reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP webpage at https://ojp.gov/funding/FAPIIS.htm.

Data on performance measures. In addition to required reports, each award recipient also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ in fulfilling its responsibilities under the Government Performance and Results Act of 1993 (GPRA), Public Law 103–62, and the GPRA Modernization Act of 2010, Public Law 111–352, OJP will require any award recipient, post award, to provide performance data as part of regular progress reporting. Successful applicants will be required to access OJP's performance measurement page at www.ojp.gov/performance for an overview of performance measurement activities at OJP.  Performance measures for this program are listed as Appendix A.

## G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page.

For contact information for Grants.gov, see the title page.

## H.  Other Information

### Freedom of Information Act and Privacy Act (5 U.S.C. 552 and 5 U.S.C. 552a)

All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that the applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement-sensitive information.

### Provide Feedback to OJP

To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply from this mailbox to messages it receives in this mailbox. Any prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, email your résumé to ojpprsupport@usdoj.gov. (Do not send your résumé to the OJP Solicitation Feedback email

account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

**Appendix A: Performance Measures Table**

Implementation Performance Measures

| Objective | Performance Measure(s) | Description | Data Recipient Provides |
|---|---|---|---|
| To support the strategic planning and development of comprehensive, community-based antigang and youth violence strategies that strengthen coordination of existing resources and activities that support multiple complementary, evidence-based programs to reduce gang and gun violence and the associated trauma to youth in the targeted communities. | Number of stakeholders (task force, coalitions, agencies). | Number of additional stakeholders (government agencies, nonprofit organizations, community groups, etc.) joining in violence prevention efforts during the reporting period. | Number of stakeholder relationships built during the reporting period. |
| | Percent increase in leveraged resources (in-kind, cash, staffing). | Percent increase in resources leveraged during the reporting period. Leveraged resources include those that are matched by cash or in-kind contributions from additional sources. | A. Number of new leveraged resources obtained during the reporting period. B. Total number of leveraged resources available during the reporting period. C. Percent (A/B). |
| | Number of memoranda of understanding (MOUs) developed during the reporting period. | An MOU is an interagency agreement whose purpose is to enable all parties to facilitate the conduct of certain efforts of mutual interest (e.g., specifying the types of information to be shared, stating the terms of the agreement, and including the signatures of all parties to the agreement). Include all formal partnering or coordination agreements. Program records are the preferred data source. | Number of MOUs developed during the reporting period. |
| | Number of agency policies or procedures created, amended, or rescinded. | Number of cross-program or agency policies or procedures created, amended, or rescinded during the reporting period. A policy is a plan or specific course of action that guides the general goals and directives of programs and/or agencies. Include policies that are relevant | Number of program/agency policies or procedures created, amended, or rescinded. |

| | | to the topic area of the program or that affect program operations. Program records are the preferred data source. | |
| | Number of media coverage episodes/events. | Total number of earned media coverage episodes/events related to violence prevention activities during the reporting period. Examples include but are not limited to op-ed articles, letters, interviews, events that draw coverage (press conferences), and appearances on broadcast news or issues programs (television) and radio, etc. | Total number of media coverage episodes/events that occurred related to violence prevention activities during the reporting period. |
| | Number of participants trained during the reporting period. | Number of program participants who received formal training related to violence prevention during the reporting period. Examples include but are not limited to training on risk, resiliency, and protective factors; trauma and its impact on children, youth, and families; and adolescent development principles and how to apply them. | Number of participants trained during the reporting period. |
| | Percent of participants trained who reported an increase in knowledge, skills, and/or abilities related to violence prevention. | Number and percent of program participants who reported an increase in knowledge, skills, and/or abilities on one or more of the following subjects: a. Risk, resiliency, and protective factors. b. Trauma and its impact on children, youth, and families. c. Adolescent development principles and how to apply them. d. Strategies for violence prevention. e. Other training. | A. Total number of participants trained during the reporting period. B. Of those trained, number of participants who reported an increase in knowledge, skills, and/or abilities related to violence prevention. C. Percent (B/A). |
| | The type of training conducted | Indicate the type of training conducted during | Select training conducted: risk, resiliency, and |

OJJDP-2018-13845

| | during the reporting period. | the reporting period. Choose all that apply. | protective factors; trauma and its impact on children, youth, and families; adolescent development principles and how to apply them; strategies for violence prevention training; other training. |
|---|---|---|---|

Additional Implementation Performance Measures. The measures below represent required direct service intervention measures in the Youth Violence module. They can be found on the OJJDP website under the Tools and Performance Measures section on Violence Prevention.

| Objective | Performance Measure(s) | Description | Data Recipient Provides |
|---|---|---|---|
| To support the implementation of comprehensive, community-based antigang and youth violence strategies and to strengthen the coordination of existing resources and activities that support multiple complementary, evidence-based programs to reduce gang activity in targeted communities. | Number of program youth served during the reporting period. | An unduplicated count of the number of individual youth served by the program during the reporting period. Definition of the number of youth served for a reporting period is the number of program youth carried over from the previous reporting period, plus new admissions during the reporting period. Program records are the preferred data source. | A. Number of program youth carried over from the previous reporting period. B. New admissions during the reporting period. |
| | Number and percent of programs/initiatives employing evidence-based programs or practices. | Number and percent of programs that implement an evidence-based program or practice. Evidence-based programs and practices include program models that have been shown, through rigorous evaluation and replication, to be effective at preventing or reducing juvenile delinquency or related risk factors, such as substance abuse. Model programs can come from many valid sources (Blueprints, OJJDP's Model Programs Guide, SAMHSA's Model Programs, State Model Program resources, etc.). | A. Number of programs implementing an evidence-based program or practice intervention model during the reporting period. B. Total number of implementing programs during the reporting period. C. Percent (A/B). |

| | | |
|---|---|---|
| | Number and percent of youth with whom an evidence-based program or practice was used. | Number and percent of youth served with whom an evidence-based model or program was used. Evidence-based models and programs include those that have been shown, through rigorous evaluation and replication, to be effective at preventing or reducing juvenile delinquency or related risk factors, such as substance abuse. Model programs can come from many valid sources (Blueprints for Violence Prevention, OJJDP's Model Programs Guide, SAMHSA's Model Programs, etc.). | A. Number of youth served using an evidence-based model or program during the reporting period. B. Total number of youth served during the reporting period. C. Percent (A/B). |
| | Number and percent of program youth who offend during the reporting period (short and long term). | Number and percent of participating program youth who were arrested or seen at a juvenile court for a delinquent offense during the reporting period. Appropriate for any youth-serving program. Official records (police, juvenile court) are the preferred data source. The number of youth tracked should reflect the number of program youth who are followed or monitored for arrests or offenses. Ideally this number should be all youth served by the program during the reporting period.

A youth may be "committed" to a juvenile facility any time that he/she is held overnight. Certain jurisdictions refer to adjudications as "sentences."

Other sentences may be community-based sanctions, such as community service, probation, etc. | A. Total number of program youth served. B. Number of program youth tracked during the reporting period or who exited the program 6–12 months ago and were tracked during the reporting period. C. Number of program youth who had an arrest or delinquent offense during the reporting period. D. Number of program youth who were committed to a juvenile facility during the reporting period. E. Number of program youth who were sentenced to adult prison during the reporting period. F. Number of youth who received another sentence during the reporting period. G. Percent offending (C/B). |

| | | Long term measures youth who exited the program 6–12 months ago and were tracked during the reporting period. | |
|---|---|---|---|
| | Number and percent of program youth who reoffend (short and long term). | Number and percent of participating program youth who were arrested or seen at a juvenile court for a new delinquent offense during the reporting period. Appropriate for any youth-serving program. Official records (police, juvenile court) are the preferred data source.<br><br>The number of youth tracked should reflect the number of program youth who are followed or monitored for new arrests or offenses. Ideally this number should be all youth served by the program during the reporting period.<br><br>Certain jurisdictions refer to adjudications as "sentences."<br><br>Other sentences may be community-based sanctions, such as community service, probation, etc.<br><br>Long term measures program youth who are followed or monitored for new arrests or offenses 6–12 months after exiting the program. | A. Total number of program youth served during the reporting period.<br>B. Number of program youth tracked during the reporting period or program youth who exited the program 6–12 months ago and were tracked during the reporting period.<br>C. Of youth tracked, number of program youth who had a new arrest or new delinquent offense during the reporting period.<br>D. Number of program youth who were recommitted to a juvenile facility during the reporting period.<br>E. Number of program youth who were sentenced to adult prison during the reporting period.<br>F. Number of youth who received another sentence.<br>G. Percent recidivism (C/B). |
| | Number and percent of youth with a gun-related offense (short and long term). | Number and percent of program youth with a new arrest or referral to juvenile court during the reporting period as a result of an offense involving, concerning, or resulting from the use or possession of a gun (handgun, firearm, or small arm).<br>Long term measures program youth who exited the program 6–12 months | A. Number of program youth served.<br>B. Number of program youth tracked during the reporting period or program youth who exited the program 6–12 months ago and were tracked during the reporting period. |

OJJDP-2018-13845

| | | | |
|---|---|---|---|
| | | ago and were tracked during the reporting period. | C. Of youth tracked, the number of program youth who had a violent gun-related arrest or delinquent offense during the reporting period.<br>D. Of youth tracked, the number of program youth who had a nonviolent gun-related arrest or delinquent offense during the reporting period.<br>E. Number of program youth who were committed to a juvenile facility during the reporting period.<br>F. Number of program youth who were sentenced to adult prison during the reporting period.<br>G. Number of youth who received another sentence during the reporting period.<br>H. Percent offending ((C+D/B). |
| | Number and percent of program youth who reoffend with a gun-related offense (short and long term). | Number and percent of program youth with a new arrest or referral to juvenile court during the reporting period as a result of an offense involving, concerning, or resulting from the use or possession of a gun (handgun, firearm, or small arm). Official records (police, juvenile court) are the preferred data source. Violent crimes or violent offenses involve the use of force or injury to the body of another person. Violent offenses include assault, assault causing bodily harm, wounding, attempted homicide, homicide, kidnapping, forcible confinement, armed robbery, and all "hands-on" sexual offenses.<br>Nonviolent crimes are defined as property, drug, and public order offenses that do not involve a threat of harm or an actual attack | A. Total number of program youth served.<br>B. Number of program youth tracked during the reporting period and program youth who exited the program 6–12 months ago and were tracked during the reporting period.<br>C. Of youth tracked, number of program youth who had a new violent gun-related arrest or delinquent offense during the reporting period.<br>D. Of youth tracked, number of program youth who had a new nonviolent gun-related arrest or delinquent offense during the reporting period.<br>E. Number of program youth who were recommitted to a juvenile facility during the reporting period. |

47

|  |  | on a victim. Examples include selling drugs, stealing, damaging property, joyriding, and disorderly conduct. Examples of nonviolent gun-related offenses include weapon possession, illegal sale of guns, brandishing of firearms, and use of a weapon as threat. Long term measures program youth who exited the program 6–12 months ago and were tracked during the reporting period. | F. Number of program youth who were sentenced to adult prison during the reporting period. G. Number of youth who received another sentence. H. Percent recidivism ((C+D)/B). |
|  | Number and percent of program youth who are victimized (short and long term). | Number and percent of program youth who were harmed or adversely affected by someone else's criminal actions during the reporting period. Victimization can be physical or psychological; it also includes damage to youth's property. Appropriate for any youth-serving program. Official records (police, juvenile court) are the preferred data source.<br><br>The number of youth tracked should reflect the number of program youth who are followed or monitored for victimization. Ideally this number should be all youth served by the program during the reporting period.<br><br>Long term measures youth who exited the program 6–12 months ago and were tracked during the reporting period for victimization. | A. Number of youth in program. B. Number of program youth tracked during the reporting period for victimization or who exited the program 6–12 months ago and were tracked during the reporting period for victimization. C. Of youth tracked, number of program youth victimized during the reporting period. D. Percent of youth victimized. |
|  | Number and percent of program youth who are revictimized (short and long term). | The revictimization measure counts the number of youth who experienced subsequent victimization. Victimization can be physical or psychological; it also includes harm or adverse effects to youth's property. The number of youth tracked should reflect the number of | A. Number of program youth who exited the program 6–12 months ago and were tracked during the reporting period for revictimization. B. Of youth tracked, the number of program youth who were revictimized |

48

| | | program youth who are followed or monitored for revictimization. Ideally this number should be all youth served by the program during the reporting period.<br><br>Long term reflects the number of program youth who are followed or monitored for revictimization 6–12 months after exiting the program. | during the reporting period.<br>C. Percent of youth revictimized. |
|---|---|---|---|
| | Number and percent of program youth who experience a gun-related victimization (short and long term). | Number and percent of program youth who were harmed or adversely affected by someone else's criminal actions during the reporting period. Victimization can be physical or psychological; it also includes damage to one's property. Appropriate for any youth-serving program. Official records (police, juvenile court) are the preferred data source. Long term measures program youth who exited the program 6–12 months ago and were tracked during the reporting period. | A. Total number of program youth served or youth who exited the program 6-12 months ago and were tracked during the reporting period for victimization.<br>B. Number of program youth tracked during the reporting period for victimization.<br>C. Of youth tracked, the number of program youth who experienced violent gun-related victimization during the reporting period.<br>D. Of youth tracked, the number of program youth who experienced nonviolent gun-related victimization during the reporting period.<br>E. Percent of youth victimized by a gun-related offense (short term) ((C+D)/B). |
| | Number and percent of program youth who experience a gun-related revictimization (short and long term). | Number and percent of program youth who were subsequently harmed or adversely affected by someone else's gun-related criminal actions during the reporting period. Victimization can be physical or psychological; it also includes damage to one's property. Appropriate for any youth-serving program. Official records (police, | A. Total number of program youth served during the reporting period or who exited the program 6-12 months ago and were tracked during the reporting period for revictimization.<br>B. Number of program youth tracked during the reporting period for revictimization.<br>C. Of youth tracked, the number of program youth |

OJJDP-2018-13845

| | | | |
|---|---|---|---|
| | | juvenile court) are the preferred data source. Long term measures program youth who exited the program 6–12 months ago and were tracked during the reporting period. | who experienced violent gun-related revictimization during the reporting period.<br>D. Of youth tracked, the number of program youth who experienced nonviolent gun-related revictimization during the reporting period.<br>E. Percent of youth revictimized by a gun-related offense ((C+D)/B). |
| | Percent of youth who exhibit a desired change in the targeted behavior. | Number and percent of program youth who exhibited a desired change in targeted behaviors during the reporting period and 6–12 months after exiting the program. Selected targeted behaviors include gang resistance/involvement, education, or employment.<br><br>Self-report or staff ratings are the most likely data sources. | A. Number of program youth served during the reporting period with the noted behavioral change.<br>B. Total number of youth receiving services for the targeted behavior during the reporting period or who exited the program 6–12 months ago who had the noted behavioral change.<br>C. Percent.<br>Targeted behavior will depend on the program's goals, activities, and targeted population. |
| | Percent decrease in gang-related incident arrests. | Percent of program youth who had a new arrest or referral to juvenile court as a result of a gang-related offense.<br>Gang-related offenses are those committed as a result of association with a gang, defined as a self-formed group of three or more youth with a name, an identity, and an elevated level of involvement in criminal activity. | A. Number of gang-related incident arrests during the reporting period.<br>B. Total number of arrests during the reporting period.<br>C. Percent of gang-related arrests (A/B). |
| | Percent decrease in gang-related homicides. | Number of gang-related homicides of program youth and/or committed by program youth during the reporting period.<br>Gang-related offenses are those committed as a result of association with a gang, defined as a self-formed group of | A. Number of gang-related homicides during the reporting period.<br>B. Total number of homicides during the reporting period.<br>C. Percent of homicides that are gang-related (A/B). |

50

| | | three or more youth with a name, an identity, and an elevated level of involvement in criminal activity. | |
|---|---|---|---|
| | Percent decrease in gang-related aggravated assaults. | Number of gang-related aggravated assaults committed by or against program youth during the reporting period. Gang-related offenses are those committed as a result of association with a gang, defined as a self-formed group of three or more youth with a name, an identity, and an elevated level of involvement in criminal activity. | A. Number of gang-related aggravated assaults during the reporting period. B. Total number of aggravated assaults during the reporting period. C. Percent of aggravated assaults that are gang-related (A/B). |
| | Percent decrease in gang-related robberies. | Number of gang-related robberies committed by or against program youth during the reporting period. Gang-related offenses are those committed as a result of association with a gang, defined as a self-formed group of three or more youth with a name, an identity, and an elevated level of involvement in criminal activity. | A. Number of gang-related robberies based on official records during the reporting period. B. Total number of robberies during the reporting period. C. Percent of robberies that are gang-related (A/B). |
| | Number of planning activities conducted. | Activities include meetings held, needs assessments undertaken, and so on, related to reducing gang-related activity. | Number of gang-related planning activities conducted during the reporting period. |

## Appendix B: Applicable Federal Law

### Certain relevant federal laws, as in effect on June 7, 2018

**8 U.S.C. § 1373**

**Communication between government agencies and the Immigration and Naturalization Service**

**(a) In general**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

OJJDP-2018-13845

**8 U.S.C. § 1226(a) & (c)**

**Apprehension and detention of aliens**

**(a) Arrest, detention, and release**
On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
  (1) may continue to detain the arrested alien; and
  (2) may release the alien on--
    (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
    (B) conditional parole; but
  (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

\*\*\*

**(c) Detention of criminal aliens**
  (1)  Custody
The Attorney General shall take into custody any alien who--
    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or
    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release
The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**8 U.S.C. § 1231(a)(4)**

(a) Detention, release, and removal of aliens ordered removed
***

    **4) Aliens imprisoned, arrested, or on parole, supervised release, or probation**

      **(A) In general**

      Except as provided in section 259(a) [1] of title 42 and paragraph (2),[2] the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

      **(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment**

      The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment-

        i.   in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title [3] and (II) the removal of the alien is appropriate and in the best interest of the United States; or

        ii.   in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

      **(C) Notice**

      Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

      **(D) No private right**

      No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**8 U.S.C. § 1324(a)(1)**

**Bringing in and harboring certain aliens**

(a) Criminal penalties

  (1)(A) Any person who—

      i.   knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter,

or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

ii.  knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

iii.  knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

iv.  encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

v.  (v)(I) engages in any conspiracy to commit any of the preceding acts, or

vi.  (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

I.  in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

II.  in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

III.  in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365 of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

IV.  in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

(C) It is not a violation of clauses [1] (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

## 8 U.S.C. § 1357(a)

### Powers of immigration officers and employees

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

**(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

**(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

**(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

**(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

**(5)** to make arrests-

**(6)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

**(7)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

**(8)** if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

**8 U.S.C. § 1366(1) & (3)**

**Annual report on criminal aliens**

56

Not later than 12 months after September 30, 1996, and annually thereafter, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing—

   (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense;

  ***

   (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal;

  ***.

**Appendix C: Federal Communication Information**

**Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)**

Each applicant must provide responses to the following questions as an attachment to the application:

1.  Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

2.  Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?

3.  If yes to either:
    o   Please provide a copy of each law or policy;
    o   Please describe each practice; and
    o   Please explain how the law, policy, or practice complies with section 1373.

## Appendix D: Certification Relating to
## 8 U.S.C. § 1226(a) & (c), 1231(a)(4), 1324(a)(4), 1357(a), & 1366(1) & (3)

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**State or Local Government:  FY 2018 Certification Relating to**
**8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)**

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1.  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

2.  I have carefully reviewed each of the following sections of title 8, United States Code:

   a.  § 1226(a) & (c) (authorizing arrest and detention of certain aliens and providing that the federal government "shall take into custody" certain criminal aliens "when the alien is released");

   b.  § 1231(a)(4) (federal government may not "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment");

   c.  § 1324(a) (forbidding any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection, or attempt[] to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts … or aid[] or abet[] the commission of any of the preceding acts");

   d.  § 1357(a) (authorizing immigration officers, "anywhere in or outside the United States" (see 8 C.F.R. § 287.5(a)), to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States"); and

   e.  § 1366(1) & (3) (requiring the Attorney General annually to submit to Congress "a report detailing … (1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense; [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal").

3.  I (and also the applicant entity) understand that USDOJ will require States and local governments (including State and local government entities, -agencies, and -officials), with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program, not to violate, or to aid or abet any violation of, 8 U.S.C. § 1324(a), and not to impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a) or relating to 8 U.S.C. § 1366(1) & (3) or 8 U.S.C. § 1226(a) & (c).

4.  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)).  Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

5.  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

   a.  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

   b.  any laws, rules, policies, or practices potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that implicate any of the requirements relating to 8 U.S.C. §§ 1226(a) & (c), 1324(a), 1357(a), & 1366(1) & (3) that are described in ¶ 3 of this certification, whether imposed by a State or local government entity, -agency, or -official.

6.  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any law, rule, policy, or practice that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that would or does— (1) violate, or aid or abet any violation of, 8 U.S.C. § 1324(a); (2) impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a); (3) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3); or (4) impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812).  I also acknowledge that OJP awards, including associated certifications, are subject to review by USDOJ, including by OJP and the USDOJ Office of the Inspector General.

_____     _____
Signature of Chief Legal Officer of the Jurisdiction          Printed Name of Chief Legal Officer

_____     _____
Date of Certification                                         Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below

**FY 2018 OJP Program:** **Gang Suppression:  A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children**

# Appendix E: Certification of Compliance

## U.S. DEPARTMENT OF JUSTICE
## OFFICE OF JUSTICE PROGRAMS

### State or Local Government:  FY 2018 Certification of Compliance with 8 U.S.C. §§ 1373 & 1644

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1)  I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP).  I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2)  I have carefully reviewed 8 U.S.C. §§ 1373(a) & (b), and 1644, including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition … and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. §§ 1373 & 1644 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3)  I (and also the applicant entity) understand that the USDOJ will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. §§ 1373 & 1644, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2018 OJP program under which this certification is being submitted (the "FY 2018 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2018 OJP Program.

(4)  I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 34 U.S.C. § 10251(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5)  I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    (a)  the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program; and

    (b)  any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2018 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. §§ 1373(a) & (b), and 1644, whether imposed by a State or local government entity, -agency, or -official.

(6)  As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2018 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 34 U.S.C. §§ 10271-10273), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____    _____
Signature of Chief Legal Officer of the Jurisdiction    Printed Name of Chief Legal Officer

_____    _____
Date of Certification    Title of Chief Legal Officer of the Jurisdiction

_____
Name of Applicant Government Entity (i.e., the applicant to the FY 2018 OJP Program identified below)

### FY 2018 OJP Program:  Gang Suppression:  A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children

**Appendix F: Application Checklist**

**OJJDP FY 2018 Gang Suppression: A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children**

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in Grants.gov:*
_____ Acquire a DUNS Number                                    (see page 32)
_____ Acquire or renew registration with SAM                   (see page 32)
*To Register with Grants.gov*:
_____ Acquire AOR and Grants.gov username/password            (see page 33)
_____ Acquire AOR confirmation from the E-Biz POC             (see page 33)
*To Find Funding Opportunity:*
_____ Search for the Funding Opportunity on Grants.gov        (see page 33)
_____ Access Funding Opportunity and Application Package      (see page 33)
_____ Sign up for Grants.gov email notifications (optional)   (see page 21)
_____ Read Important Notice: Applying for Grants in Grants.gov
_____ Read OJP policy and guidance on conference approval, planning, and reporting
        available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                               (see page 14)
*After Application Submission, Receive Grants.gov Email Notifications That:*
_____ (1) Application has been received
_____ (2) Application has either been successfully validated or rejected with errors
                                                               (see page 34)
*If No Grants.gov Receipt, and Validation or Error Notifications are Received:*
_____ Contact Grants.gov and/or SAM regarding technical difficulties. Refer to the section:
        Experiencing Unforeseen Grants.gov Technical Issues        (see page 34)
_____ Contact the Response Center at grants@ncjrs.gov to request to submit the application
        after the deadline because of unforeseen technical issues. Refer to the section:
        Experiencing Unforeseen Grants.gov Technical Issues        (see page 34)

**Overview of Post-Award Legal Requirements:**

_____ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2018 Awards" in the OJP Funding Resource Center at https://ojp.gov/funding/index.htm.

**Scope Requirement:**

_____ The federal amount requested is within the allowable limit(s) of $1.2 million.

**Eligibility Requirement:** Refer to page 1 of the solicitation.

**What an Application Should Include:**

_____ Application for Federal Assistance (SF-424)              (see page 16)
_____ Intergovernmental Review                                 (see page 16)

\_\_\_\_\_ Project Abstract                                                   (see page 17)
\_\_\_\_\_ Program Narrative                                                  (see page 17)
    \_\_\_ Description of the Issue
    \_\_\_ Goals, Objectives, and Performance Measures
    \_\_\_ Project Design and Implementation
    \_\_\_ Capabilities and Competencies
\_\_\_\_\_ Budget Detail Worksheet                                            (see page 23)
\_\_\_\_\_ Budget Narrative                                                   (see page 23)
\_\_\_\_\_ Indirect Cost Rate Agreement (if applicable)                       (see page 26)
\_\_\_\_\_ Tribal Authorizing Resolution (if applicable)                      (see page 27)
\_\_\_\_\_ Financial Management and System of Internal Controls Questionnaire (see page 27)
\_\_\_\_\_ Disclosure of Lobbying Activities (SF-LLL)                          (see page 28)
\_\_\_\_\_ Certifications of Compliance with Certain Federal Laws by Chief Legal Officer

\_\_\_\_\_ Additional Attachments                                             (see page 28)
    \_\_\_\_\_ Information regarding communication with DHS and/or ICE
    \_\_\_\_\_ Applicant Disclosure of Pending Applications
    \_\_\_\_\_ Logic model
    \_\_\_\_\_ Timeline or milestone chart
    \_\_\_\_\_ Résumés of all key personnel
    \_\_\_\_\_ Job descriptions outlining roles and responsibilities for all key positions
    \_\_\_\_\_ Letters of support/memoranda of understanding from partner organizations
    \_\_\_\_\_ Evidence of history and organizational readiness
    \_\_\_\_\_ Geographical map of targeted area(s)

\_\_\_\_\_ Request and Justification for Employee Compensation; Waiver (if applicable)
                                                                            (see page 14)